UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ALLSTATE INSURANCE CO., *et al.*,

                    Plaintiffs,

          -against-

CPM MED SUPPLY INC., *et al.*,

                    Defendants.
----------------------------------------------------------X

**MEMORANDUM AND ORDER**
23 CV 5864 (CLP)

**POLLAK**, United States Magistrate Judge:

On August 2, 2013, plaintiffs Allstate Insurance Company, Allstate Fire and Casualty

Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance

Company (collectively, "plaintiffs" or "Allstate") commenced this action against defendants

CPM Med Supply Inc. ("CPM Med"), and Tamerlan Iffraimov ("Iffraimov"), along with John

Does 1-5 and ABC corporations 1-5 (collectively, the "defendants"), alleging violations of the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., and

violations of New York State common law, seeking damages and declaratory relief.  (Compl.[1]).

Currently pending before this Court is defendants' motion to dismiss the Complaint, pursuant to

Fed. R. Civ. P. 12(b)(6), for failure to state a claim (the "Motion" or "Mot.").  (ECF No. 20).[2]

For the reasons set forth below, the defendants' Motion is GRANTED in part and

DENIED in part.

BACKGROUND

The Complaint alleges that from at least October 2013 and continuing through the date of

the filing of the Complaint, defendants engaged in a scheme to defraud automobile insurance

---

[1] Citations to "Compl." refer to plaintiffs' Complaint, filed on August 2, 2023.  (ECF No. 1).
[2] The parties have consented to the undersigned's jurisdiction for all purposes.  (ECF Nos. 18–19).

companies through New York State's No-Fault system through the submission of hundreds of false and/or fraudulent insurance claims for post-surgical rehabilitative durable medical equipment ("DME")[3] devices, including Continuous Passive Motion ("CPM") machines and Cold Water Circulation Units, also known as Cold Therapy Units ("CTUs").  (Compl.  ¶¶ 1–2).  A CPM machine provides post-surgical treatment in which passive movement is performed on a joint for hours at a time, the theory being that recovery will be faster because the continuous movement reduces the stiffness in soft tissues, increases range of motion, promotes the healing of joint surfaces, and prevents adhesions from developing.  (Id. ¶ 127).  Plaintiffs allege that CPM devices have no medical usefulness following total knee replacements, repairs of the anterior cruciate ligament, and other arthroscopic procedures, and are no more effective than standard physical therapy.  (Id. ¶¶ 128–29 (citing studies)).

A CTU combines cold temperatures and compression to decrease pain, swelling, use of medication, length of hospital stay, and length of recovery.  (Id. ¶ 140).  CTUs use pneumatic or mechanical pumps that are battery or electrically operated and have been found useful in the post-operative care for joint reconstructive surgeries in the three to four days after surgery.  (Id. ¶ 142).  Plaintiffs allege that studies have shown that CTUs are no more effective than standard ice packs and compressions.  (Id. ¶¶ 145–49 (citing studies)).  Plaintiffs also allege that even when medically useful, CTUs should be used for no more than three to four days after surgery. (Id. ¶ 150).

Plaintiffs allege that every piece of rental DME supplied by CPM Med was pursuant to a predetermined course of treatment irrespective of medical necessity, based on illicit kickback or other agreements between and among the defendants and various No-Fault clinics.  (Id. ¶ 3).

---

[3] Durable medical equipment refers to those medical supplies and devices that clients use in their homes. (Id. ¶ 2).

Plaintiffs seek to recover more than $648,000 that defendants allegedly received through the submission of these false and fraudulent insurance claims.  (Id. ¶ 2).

As automobile insurance companies operating in the State of New York, plaintiffs are subject to the Comprehensive Motor Vehicle Insurance Reparations Act of New York State, N.Y. Ins. Law §§ 5101 et seq. ("No-Fault Insurance Law").[4]  (Compl. ¶¶ 15, 63, 73–74). Defendant CPM Med is alleged to be a retail DME supply company that bills for medical supplies provided to individuals covered under the No-Fault Law ("Covered Persons").  (Id. ¶ 64).  It is alleged that CPM Med accepts assignments of benefits from covered individuals and then submits claims for reimbursement from No-Fault insurance carriers, such as plaintiffs.  (Id. ¶¶ 65, 75).  The individual defendant, Iffraimov, is alleged to be the principal, officer, and/or director of CPM Med, operating, managing and controlling its activities.  (Id. ¶¶ 64, 65).  The Complaint names as additional defendants John Does 1 through 5 and ABC Corporations 1 through 5,[5] alleging that while their identities are unknown, they conspired, participated and assisted defendants CPM Med and Iffraimov in conducting the kickback scheme in order to obtain referrals, prescriptions and patients.  (Id. ¶¶ 66, 67).

Plaintiffs allege that beginning on October 23, 2013, and continuing until the date of the Complaint, defendants engaged in a systemic fraudulent billing scheme based upon the alleged provision of DME such as compression devices, sustained acoustic medicine machines, and

---

[4] The No-Fault Insurance Law requires insurers to pay for medical expenses of pedestrians and occupants of insured motor vehicles who suffer injuries stemming from the operation of insured motor vehicles in the State of New York.  See N.Y. Ins. Law § 5103(a).  The law requires automobile insurers to cover no-fault medical treatment costs up to $50,000.  See id. §§ 5102(a)(1), 5102(b), 5103.  The law enables both the policy holder and the policy holder's healthcare supplier to submit bills to the insurer for medical treatment.  Id. § 5102.  For a more thorough discussion of New York's No-Fault Insurance Law, see Allstate Ins. Co. v. Aminov, No. 11 CV 2391, 2014 WL 527834, at *3 (E.D.N.Y. Feb. 7, 2014), and Allstate Ins. Co. v. Elzanaty, 916 F. Supp. 2d 273, 281–83 (E.D.N.Y. 2013).

[5] Plaintiffs intend to add the names of these defendants once they are identified during discovery.  (Id. ¶¶ 66, 67).

orthotic devices to Covered Persons under the No-Fault Law. (Id. ¶ 100).  According to the Complaint, defendant Iffraimov formed CPM Med to engage in a scheme whereby Iffraimov paid kickbacks to No-Fault Clinics in exchange for prescriptions of DME and orthotic devices. (Id. ¶¶ 100–102).  Plaintiffs allege that the Covered Persons receiving treatment with these devices were involved in minor accidents, suffered soft tissue injuries, and did not require extensive treatment.  (Id. ¶ 121).  It is further alleged that these individuals were referred for medical treatment from fraudulent "medical mill" clinics for, among other things, various items of DME and/or orthotic devices.  (Id.)  As part of the scheme, it is alleged that many of these Covered Persons were referred for arthroscopic surgery, which was not medically necessary, and then were sent to surgical centers in New York and New Jersey, where they were prescribed various treatment services, as well as DME and/or orthotic devices.  (Id. ¶¶ 121–22).  It is alleged that in many cases, Covered Persons received three or more items of DME or orthotic devices for up to 28 days or longer at a cost of more than $8,000.  (Id. ¶ 123 (citing examples)).  Plaintiffs allege not only that these devices are not medically necessary, but also that there are other courses of treatment that are less expensive and less intrusive.  (Id. ¶ 124).

Plaintiffs further allege that defendants obtained prescriptions that were issued pursuant to a predetermined course of treatment, without regard to medical need; arranged for the No-Fault Clinics to have assignments of benefits and acknowledgment of delivery receipts signed by the covered individuals; and systematically submitted bills to insurers, including plaintiffs, for expensive rental DME and/or orthotic devices, without regard to patient need, that were never provided or were provided pursuant to fraudulent prescriptions.  (Id. ¶¶ 102–03).  In exchange for kickbacks or other financial compensation, the No-Fault Clinics arranged for their health care

practitioners ("HCPs")[6] to write prescriptions for DME pursuant to a pre-determined protocol, regardless of any individual factors related to the covered individual, or to alter the prescriptions to add expensive DME.  (Id. ¶ 106).  The prescriptions were given to CPM Med directly to ensure that patients did not fill the prescriptions with a legitimate supplier of DME.  (Id. ¶ 107).  Plaintiffs allege that the delivery receipts submitted by CPM to plaintiffs routinely misrepresented the DME or orthotic devices provided, and "deliberately obscured identifying information" relating to the DME in order to prevent plaintiffs from determining if the specific device was medically necessary and what the appropriate charge should be.  (Id. ¶¶ 110, 111).

Plaintiffs allege that, as part of the scheme, CPM Med routinely supplied expensive Compression Devices or CTUs that were not medically necessary and submitted "fraudulent bills" for such devices that required a customized fitting that was never performed.  (Id. ¶¶ 112–113).  According to plaintiffs, defendants filled needless prescriptions for CPM devices, notwithstanding that these devices are not medically useful as treatment for routine knee, and shoulder arthroscopic surgeries.  (Id. ¶ 132).  It is further alleged that defendants submitted fabricated or altered prescription forms for CTUs when not medically necessary, for patients who underwent basic joint procedures, with no surgery at all.  (Id. ¶¶ 143–44).  According to plaintiffs, CPM Med routinely filled prescriptions for CTUs to be used for anywhere between three to six weeks, despite their medical usefulness of only three to four days.  (Id. ¶ 151).  Plaintiffs further allege that often the DME or orthotic devices prescribed contradicted the purported treatment plan.  (Id. ¶ 118).  According to plaintiffs, Covered Individuals who were involved in the same accident often received the same or similar DME and/or orthotic devices regardless of their age, physical condition, location in the vehicle, etc.  (Id. ¶ 114).  Plaintiffs set

---

[6] Plaintiffs define "HCPs" as the doctors or chiropractors associated with the No-Fault Clinics.  (Id. ¶ 5).

forth in the Complaint specific examples of HCPs at the No-Fault Clinics prescribing identical DME and/or orthotic devices to individuals in the same accident.  (See id. ¶ 116).

According to the Complaint, defendants, through CPM Med, submitted prescription forms that they knew or should have known were fabricated and/or fraudulently altered or duplicated.  (Id. ¶ 126).  Plaintiffs also allege that until April 2022, CPM Med routinely submitted bills for the rental of CPM devices for use on the knee, using billing code E0935, with an inflated daily rate of $85.00 a day.  (Id. ¶ 137).  Since April 2022, CPM Med allegedly submitted bills for medically unnecessary CPM devices at the rate of $18.88 per day.  (Id.; see also id., Ex. 3).  Prior to April 2022, the Medicare rate for a CPM was $21.50 per day; the WCB DME Fee Schedule lists knee CPM rates at $18.88 per day and for other limbs at $31.19 per day, resulting in grossly inflated charges by defendants prior to April 4, 2022.  (Id. ¶¶ 137, 138).  Plaintiffs allege that defendants submitted bills to plaintiffs for CTU rentals at the rate of $49.99 per day, using billing code E0236.  (Id. ¶ 154).  Effective April 4, 2022, defendants shifted to billing code E0218, charging $5.48 per week. (Id.)

In addition to defendants' fraudulent billing for DME devices, plaintiffs allege that defendants also submitted bills for orthotic devices that required fitting and adjustment or for pre-fabricated devices, all of which were medically unnecessary.  (Id. ¶¶ 156, 157).  Specifically, defendants would submit bills for knee braces using code L1832, which is reserved for pre-fabricated DME, or orthotic devices that require customized fitting, but which fitting was never performed for the Covered Person.  (Id. ¶ 159).  To the extent knee braces were supplied, plaintiffs allege that they were cheap one-size-fits-all devices for which no fitting was ever performed.  (Id. ¶ 160).

Plaintiffs claim that defendants took various steps to conceal their fraud, including the submission of claims based on a pre-determined treatment protocol, defendants' concealment of its kickback and/or other financial arrangements with the No-Fault Clinics and other defendants, defendants' misrepresentation of codes and reimbursement amounts, and the submission of fraudulent claims in violation of defendants' statutory and contractual obligation to promptly and fairly process claims within 30 days.  (Id. ¶ 162).  Plaintiffs allege that defendants' conduct resulted in the expenditure by plaintiffs of costs to verify the fraudulent claims through examinations under oath, attorneys' fees, court reporter fees, and independent medical examination fees, and peer review.  (Id. ¶ 119).  According to the Complaint, plaintiffs incurred damages exceeding $648,800 as a result of the fraudulent billing scheme.  (Id. ¶ 163).

The Complaint contains four causes of action:  1) the First Claim alleges a RICO violation, pursuant to 18 U.S.C. § 1962(e) (id. ¶¶ 165–178); 2) the Second Claim alleges a claim for common law fraud (id. ¶¶ 180–188); 3) the Third Claim alleges a claim of unjust enrichment (id. ¶¶ 190–192); and 4) the Fourth Claim seeks a Declaratory Judgment, pursuant to 28 U.S.C. § 2201, declaring that defendants are not entitled to receive payment on any pending, previously-denied, and/or submitted unpaid claims and plaintiffs are under no obligation to pay such No-Fault claims (id. ¶¶ 194–200).

## DISCUSSION

Defendants move to dismiss the Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), contending that plaintiffs have failed to allege sufficient facts to state a plausible claim under RICO or for a declaratory judgment, and that the Complaint fails to allege the basic elements for a claim of fraud or unjust enrichment.

I.    Legal Standard[7]

Under Rule 12(b)(6), the Court must determine whether the plaintiff has "state[d] a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff.  See, e.g., DiFolco v. MSNBC Cable, LLC, 622 F.3d 104, 110–11 (2d Cir. 2010).  A court need not, however, accept the truth of legal conclusions or labels couched as factual allegations, see Papasan v. Allain, 478 U.S. 265, 286 (1986), and "bald assertions and conclusions of law will not suffice." Amron v. Morgan Stanley Inv. Advisors, Inc., 464 F.3d 338, 344 (2d Cir. 2006) (quoting Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996)).  The applicable standard is not so stringent that the complaint is required to demonstrate probability, nor is it so lax that the complaint may plead only facts that show a mere possibility that plaintiff is entitled to relief or that are merely consistent with a defendant's liability.  See id.  Instead, a plaintiff must provide enough factual support that, if true, would "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007).

Thus, to survive a motion to dismiss, "a complaint must contain enough facts to state a claim to relief that is plausible on its face."  Biro v. Conde Nast, 807 F.3d 541, 544 (2d Cir. 2015) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570), cert. denied, 578 U.S. 976 (2016). A claim is sufficiently plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "The issue is not whether a plaintiff will ultimately prevail

---

[7] Unless noted, caselaw quotations in this order accept all alterations and omit internal quotation marks, citations, and footnotes.

8

but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds, Harlow v. Fitzgerald, 457 U.S. 800 (1982); accord Walker v. Schult, 717 F.3d 119, 124 (2d Cir. 2013).  However, if the well-pleaded facts ultimately allow no more than an inference of a "mere possibility of misconduct" and the plaintiff has only alleged, rather than shown, an entitlement to relief, the federal pleading standard of Rule 8(a)(2) has not been satisfied.  Ashcroft v. Iqbal, 556 U.S. at 679.

In considering a motion to dismiss, courts may take into account the following categories of information and documents:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, [and] (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint . . . .

In re Merrill Lynch & Co., Inc., 273 F. Supp. 2d 351, 356–57 (S.D.N.Y. 2003), aff'd, 396 F.3d 161 (2d Cir. 2005), cert. denied, 546 U.S. 935 (2005); see also Van Bourgondien-Langeveld v. Van Bourgondien, No. 10 CV 77, 2010 WL 5464890, at *3 (E.D.N.Y. Dec. 29, 2010).

II.    Plaintiffs' RICO Claims

Defendants first seek to dismiss plaintiffs' RICO claims brought under 18 U.S.C. § 1962(c).  The statute prohibits:

> [a]ny person employed by or associated with any enterprise [from engaging] in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 U.S.C. § 1962(c).

To obtain relief under this provision, a plaintiff must show that (1) a clear violation of Section 1962 has occurred, and (2) the violation led to an injury to business or property.  See

Dolan v. Fairbanks Capital Corp., 930 F. Supp. 2d 396, 408 (E.D.N.Y. 2013) (citing DeFalco v. Bernas, 244 F.3d 286 (2d Cir. 2001)).  A clear violation of Section 1962 occurs where a plaintiff shows that a defendant conducts an enterprise through a pattern of racketeering activity.  See DeFalco v. Bernas, 244 F.2d at 306.  A plaintiff meets this burden by showing "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce."  Allstate Ins. Co. v. Aminov, No. 11 CV 2391, 2014 WL 527834, at *5 (E.D.N.Y. Feb. 7, 2014); see also Moss v. Morgan Stanley Inc., 719 F.2d 5, 17 (2d Cir.1983);  Allstate Ins. Co. v. Valley Phys. Med. & Rehab., P.C., No. 05 CV 5934, 2009 WL 3245388, at *3 (E.D.N.Y. Sept. 30, 2009); State Farm Mut. Auto. Ins. Co. v. Grafman, 655 F. Supp. 2d 212 (E.D.N.Y. 2009).

In moving to dismiss the plaintiffs' RICO claim, defendants contend that the Complaint fails to identify any of the "No-Fault Clinics" where the prescriptions were allegedly filled, and that plaintiffs also fail to identify or name as defendants any of the doctors and chiropractors who allegedly prescribed the unnecessary DME, despite the fact that Allstate knows their identity through the prescriptions.  (Defs.' Mem.[8] at 2).  Defendants also contend that Allstate's alternate theory—namely, the lack of medical necessity for these devices—fails not only because Allstate has failed to name any particular device that was prescribed without medical necessity, but also because the doctors prescribed these devices based on their views of the patients' needs, and thus plaintiffs have failed to adequately allege proximate cause.  (Id.)  Defendants also seek to dismiss the RICO claims based on the doctrines of res judicata and collateral estoppel, noting

---

[8] Citations to "Defs.' Mem." refer to the defendants' Memorandum of Law in Support of FRCP 12(b)(6) Motion.  (ECF No. 20-13).

that even though Allstate has provided lists of bills that it purportedly paid and a list of unpaid claims for DME, Allstate fails to disclose that over 300 of these claims have proceeded to arbitration and either the arbitration has resulted in favor of defendants or plaintiffs have voluntarily agreed to pay the claims.  (Id.)  Defendants further argue that many of the claims for which damages are sought under the RICO claim are barred by the statute of limitations.  The Court addresses the relevant issues below.

      A.     Individual Defendant and RICO Enterprise

RICO, by its terms, applies to the acts of "any person employed by or associated with any enterprise engaged in" acts prohibited by the statute.  18 U.S.C. § 1962(c).  The statute in turn defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," id. § 1961(3), and "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity," id. § 1961(4).  The Second Circuit has further clarified that a RICO enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that various associations function as a continuing unit."  United States v. Applins, 637 F.3d 59, 73 (2d Cir. 2011).

Courts have read the definitions and prohibitions of RICO to require a distinction between the individual defendants and the alleged enterprise.  See, e.g., Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 344 (2d Cir. 1994) (noting that "the person and the enterprise referred to must be distinct" to satisfy Section 1962).  This requirement may be satisfied, however, by a "formal legal distinction between [the] 'person' and [the] 'enterprise.'"  Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 165 (2001); accord Palatkevich v. Choupak, No. 12 CV 1682, 2014 WL 1509236, at *15 (E.D.N.Y. Jan. 24, 2014) (explaining that "a natural person named as the defendant 'person' is inherently distinct from a

corporate entity 'enterprise' for which he acts as an agent; in such a case, the distinctness requirement is met").

Plaintiffs successfully plead that CPM Med. is an "enterprise" engaged in interstate commerce, and that defendant Iffraimov is a natural person, distinct from the enterprise, who knowingly conducted and participated in the affairs of CPM Med through a continuous pattern of racketeering activity.  (Compl. ¶¶ 64–65).  In the Complaint, plaintiffs describe the process through which Iffraimov and the other defendants participated in the racketeering activity and establish sufficient connections between them and the alleged CPM RICO enterprise.  (See id. ¶¶ 73–160).  Courts have held that this degree of specificity in pleading is sufficient to satisfy the distinctiveness requirement under RICO, when alleged in the context of a no-fault billing insurance case.  See, e.g., Government Emps. Ins. Co. v. AMD Chiropractic, P.C., No. 12 CV 4295, 2013 WL 5131057 (E.D.N.Y. Sept. 12, 2013); Liberty Mut. Ins. Co. v. Excel Imaging, P.C., 879 F. Supp. 2d 243 (E.D.N.Y. 2012).  As such, plaintiffs have sufficiently pleaded the first and sixth elements necessary to find a RICO violation.

### B.    Predicate Acts

Having established that the Complaint adequately alleges the existence and independence of both the individual defendant and the enterprise through which the scheme was purportedly carried out, the Court now turns to the allegations as to those predicate acts constituting racketeering activity.  "Racketeering activity" is defined by the statute to refer to any of several enumerated acts.  Included among those enumerated in the statute is mail fraud, which is alleged in this case.  See 18 U.S.C. § 1961(1).  Plaintiffs suing under RICO must show that each defendant participated in at least two predicate acts of racketeering within a ten-year period.  Id. § 1961(5).  To show a defendant's "participation" in the racketeering activity, a plaintiff need only demonstrate that defendant played *some* part in the operation of the enterprise, even if not

12

the predominant one.  See Reves v. Ernst & Young, 507 U.S. 170, 179 (1993) (explaining that "the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise").  Courts in this circuit have noted that "[t]he participation requirement is a relatively low hurdle for plaintiffs to clear, especially at the pleading stage."  Allstate Ins. Co. v. Nazarov, No. 11 CV 6187, 2015 WL 5774459, at *13 (E.D.N.Y. Sept. 30, 2015) (quoting Government Emps. Ins. Co. v. Scheer, No. 13 CV 4039, 2014 WL 4966150, at *5 (E.D.N.Y. Aug. 18, 2014), report and recommendation adopted, 2014 WL 4966137 (E.D.N.Y. Sept. 30, 2014)).

Additionally, Rule 9 of the Federal Rules of Civil Procedure requires that all allegations of fraud must be stated "with particularity" as to the circumstances surrounding the fraud.  Fed R. Civ. P. 9(b).  This requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006).  Thus, to successfully state a claim for mail fraud, a plaintiff must allege *with particularity* "(1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme."  Allstate Ins. Co. v. Nazarov, 2015 WL 5774459, at *12 (quoting Government Emps. Ins. Co. v. Hollis Med. Care, P.C., No. 10 CV 4341, 2011 WL 5507426, at *7 (E.D.N.Y. Nov. 9, 2011)).  To fairly allege the "use of interstate mails," a plaintiff need only allege that the scheme was such that "use of the mails will follow in the ordinary course of business, or that such use can reasonably be foreseen, even though not actually intended."

13

Abramovich v. Oliva, No. 11 CV 1755, 2012 WL 3597444, at *10 (E.D.N.Y. Aug. 20, 2012) (quoting United States v. Tocco, 135 F.3d 116, 124 (2d Cir. 1998)).

To satisfy these requirements, plaintiffs allege that the defendants knowingly engaged in thousands of acts of mail fraud beginning as early as October 2013, in furtherance of a scheme to defraud plaintiffs via New York's No-fault automobile insurance system.  (Compl. ¶¶ 1–11, 100–160, 170–176).  Plaintiffs attach to the Complaint an Appendix purporting to show demonstrative predicate acts on the part of the defendants, all of which include making false and misleading statements of various types in connection with the nature, prescription, and provision of DME and/or orthotic devices, as well as the appropriate fee for use of said DME and/or orthotic devices.  (See Compl. Appx. (ECF No. 1-3) at 2–8).  Each of these predicate acts is alleged to have involved a mailing made by Iffraimov in furtherance of the alleged scheme, and these mailings are detailed in each entry in the Appendix.  (Id.; Compl. ¶¶ 166, 173–174).  In addition to the Appendix, plaintiffs attach to the Complaint a series of exhibits, including a "Representative Sample of Paid Claims for Medical Equipment and/or Other Services Provided Based Upon a Predetermined Course of Treatment Regardless of Medical Necessity"; a "Representative Sample of Unpaid No-fault Claims that Form the Basis of Plaintiffs' Request for Declaratory Relief"; "Representative Sample of Claims in Which Defendants Submitted Fraudulent Bills for CPM Devices Under Codes E0935 and/or E0936"; a "Representative Sample of Claims in Which Retail Defendants Submitted Fraudulent Bills for Cold Water Circulation Units Under Code E0236 and/or E0218"; and a "Representative Sample of Claims in Which Retail Defendants Submitted Fraudulent Bills for Knee Braces Under Codes L1832." (ECF No. 1-4).  The Complaint explicitly incorporates by reference the Appendix and exhibits, and the allegations contained therein.  (Compl. ¶ 166).

14

Defendants challenge the sufficiency of plaintiffs' pleadings with respect to the predicate acts requirement on the ground that RICO claims based on mail or wire fraud "must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." (Defs.' Mem. at 11 (quoting Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 489 (2d Cir. 2014)). To the extent that plaintiffs rely on the lists provided in the Appendix as constituting a "representative sample of predicate acts" of mailings, defendants contend that the Appendix fails to specify what statements plaintiff contends were fraudulent; fails to identify the speaker or where and when the statements were made; and fails to explain why the statements were fraudulent. (Id. (citing Nakahata v. New York-Presbyterian Healthcare Syst., Inc., 723 F.3d 192, 197 (2d Cir. 2013))).

Defendants note that the Appendix fails to indicate what was fraudulent about any of the specific alleged bills/scripts, nor does it affirmatively state that the item was mailed and when it was received, simply noting the "approximate date of mailing." (Id. at 12). Defendants argue that to meet the particularity requirement, Allstate was required to plead more than simply the mailing of the bill and a conclusory allegation that the bill was fraudulent in one of the several ways listed at the top of the predicate acts index. (Id. (citing Babb v. Capitalsource, Inc., 588 F. App'x 66, 69 (2d Cir. 2015)). See also Crystal v. Foy, 562 F. Supp. 422, 425–26 (S.D.N.Y. 1983) (holding that "[s]imply listing a mass of documents does not satisfy Rule 9(b). Plaintiff must indicate how . . . these sources . . . provide the requisite factual support for the complaint's accusations . . . and must link . . . the sources to subsequent allegations in the pleadings"); Lakonia Mgmt. Ltd. v. Meriwether, 106 F. Supp. 2d 540, 554 (S.D.N.Y. 2000) (holding that plaintiff's "numerous conclusory . . . accusations" regarding the supposed fraudulent scheme did not suffice since "not once in its 35-page Complaint or its 90-page RICO statement does plaintiff

15

identify a misrepresentation, omission[,] or any other deceptive act which would evidence such a scheme").

In response, plaintiffs argue that the Complaint "need not be specific as to each allegation of mail or wire fraud when the nature of the RICO scheme is sufficiently pleaded so as to give notice to the defendants." (Pls.' Opp.[9] at 6–7 (quoting <u>Allstate Ins. Co. v. Rozenberg</u>, 771 F. Supp. 2d 254, 263 (E.D.N.Y. 2011))). Plaintiffs contend that they need only delineate the specific circumstances constituting the overall fraudulent scheme. (<u>Id.</u> at 7 (citing <u>AIU Ins. Co. v. Olmecs Med. Supply, Inc.</u>, No. 04 CV 2934, 2005 WL 3710370, at *11 (E.D.N.Y. Feb. 22, 2005))). Plaintiffs further argue that "the predicate acts table lists hundreds of representative samples of Defendants' acts of mail fraud and identifies: (i) the approximate mailing date of the fraudulent billing submissions; (ii) who mailed them; (iii) to whom they were mailed; (iii) [<i>sic</i>] claimant initials and claim numbers for each billing submission; (iv) the billing code used, and (iv) the nature of the misrepresentations[10] in the billing submission." (<u>Id.</u> at 8 (citing ECF No. 1-3)). Plaintiffs further cite Exhibit 4 to the Complaint, which lists representative fraudulent claims submitted for reimbursement for which plaintiffs seek a declaratory judgment based on a predetermined course of treatment that was not medically necessary, and the use of improper codes. (<u>Id.</u> (citing ECF No. 1-4)).

Plaintiffs are correct that they need not detail, for each specific claim of mail fraud, the fraudulent statements and the reasons they were fraudulent, the speaker, or the time and place of the statements. <u>See</u> <u>First Interregional Advisors Corp. v. Wolff</u>, 956 F. Supp. 480, 485

---

[9] Citations to "Pls.' Opp." refer to plaintiffs' Memorandum of Law In Opposition to Defendants' FRCP 12(b)(6) Motion to Dismiss. (ECF No. 23).

[10] At the top of the predicate acts chart, plaintiffs provide a list of 9 example reasons why a claim is allegedly the product of a misrepresentation, but the reasons do not appear to be identified for any of the specific bills or scripts. (ECF No. 1-3).

(S.D.N.Y. 1997) (holding that in the context of a RICO action, the complaint "need not be specific as to each allegation of mail or wire fraud when the nature of the RICO scheme is sufficiently pleaded so as to give notice to the defendants"). Nor need they allege that each of the mailings themselves contained fraudulent information. See AIU Ins. Co. v. Olmecs Medical Supply, Inc., 2005 WL 3710370, at *11 (holding that in a complex civil RICO case, when the mail is used "in furtherance of a master plan to defraud, the mailings need not contain fraudulent information, and a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications is sufficient to satisfy Rule 9(b)"). However, as plaintiffs themselves admit, "[t]o satisfy Rule 9(b), a RICO complaint must still: (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent." (Pls.' Opp. at 6 (quoting Lerner v. Fleet Bank, N.A., 459 F.3d at 290). Plaintiffs have not met that standard here.

Each of the cases relied upon by Allstate to argue the contrary is distinguishable in that, in addition to providing similar charts, the complaints contained more specific detail regarding at least some of the alleged fraudulent claims. In Allstate Insurance Co. v. Rozenberg, the complaint identified several management defendants, several medical professional corporations (the "PC defendants"), and several individual defendants, all of whom allegedly participated in a mail fraud scheme through the fraudulent incorporation of the PC defendants and the submission of fraudulent bills for medical services. 771 F. Supp. 2d at 263. The complaint contained specific allegations as to each defendant and their role in the enterprise, including the defendant who misdiagnosed patients, the defendants who implemented the treatment schemes, and the defendant who laundered the fraudulent proceeds of the scheme. See id. at 263–64. While the court held that to plead a claim based on fraudulent incorporation, the plaintiffs "were not

required to plead that the material misrepresentations were for fraudulent medical services," 771 F. Supp. 2d at 263, it was clear from the complaint that plaintiff had alleged more detail than is alleged in the instant case.

Similarly, in State Farm Mutual Auto Insurance Co. v. Grafman—another case relied upon by Allstate—the plaintiff brought claims against various named defendants, including licensed doctors, wholesalers and retailers of DME and other medical equipment, alleging that the medical providers were not properly licensed and owned by medical doctors as required by New York law, and that they submitted false invoices for items that were never provided to insureds.  655 F. Supp. 2d at 217.  While the court held that in a complex RICO action, "Rule 9(b) does not require that the temporal or geographic particulars of each mailing be stated with particularity," id. (quoting AIU Ins. Co. v. Olmecs Med. Supply, Inc., 2005 WL 3710370, at *11), the court also noted that the pleadings in "identified the 'speakers,' that is, creators of the false insurance claims, and ha[d] proffered an explanation as to why these speakers' statements [we]re fraudulent," id. at 228; see also Sterling National Bank v. A-1 Hotels Int'l, Inc., No. 00 CV 7352, 2001 WL 282687, at *3, *12 (S.D.N.Y. Mar. 22, 2001) (finding sufficient plaintiff's allegations of over 200 fraudulent statements where the complaint also provided "nine specific examples" to demonstrate the pattern of the fraud).

Finally, in AIU Ins. Co. v. Olmecs Med. Supply, Inc., the plaintiff identified 10 prescribing doctors and chiropractors, along with several named retailers and wholesalers of medical supplies, and for each RICO event, identified the supplies billed for, the billing codes, the charge for each item, the name of the wholesale defendant whose fraudulent invoice was submitted in support of the charge, and the nature and date of the mailings associated with each charge.  2005 WL 3710370 at *12; see also Allstate v. Afanasyev, No. 12 CV 2423, 2016

18

WL1156769, at *9 (E.D.N.Y. Feb. 11, 2016) (identifying the various participants in the fraudulent scheme and detailing predicate acts based on their conduct).

By contrast to the cases cited in the plaintiff's Memorandum of Law, the instant Complaint alleges that defendants CPM and Iffraimov engaged in the fraudulent billing scheme described in the Complaint, but notably fails to identify a single doctor or chiropractor, patient, or medical supplier who participated in the scheme with the named defendants.  Unlike the pleadings in Olmec or in State Farm Mutual Automobile Insurance Co. v. Kalika, No. 04 CV 4631, 2006 WL 6176152, at *1 (E.D.N.Y. Mar. 16, 2006), where the plaintiffs identified the specific prescribing doctor or retail defendant who submitted the claim, and a description of the unnecessary tests or supplies being charged for, here not a single prescribing doctor, retail or wholesale provider has been named.

Moreover, while plaintiffs have provided an extensive list of mailings that they generally claim to be false, and provided at least nine possible explanations of why those mailings may have been false, they do not tie the vast majority of those mailings to a specific theory of fraud, nor do they highlight "specific examples" of fraudulent mailings related to each of those theories of fraud, or specifically allege "the participation of each member" in producing any of the purportedly fraudulent mailings noted in the Appendix to the Complaint.  Sterling National Bank v. A-1 Hotels Int'l, Inc., 2001 WL 282687, at *3.[11]  To the extent that plaintiffs seek to rely on the "Representative Sample" charts contained in the various exhibits to the Complaints, those charts suffer the same flaw as the one found in the Appendix—without alleging any additional information about specific examples of fraudulent activity, the charts lack the degree of

---

[11] While the Complaint does highlight a few claims falling within a limited number of specific categories of allegedly fraudulent activity (see Compl. ¶¶ 115–19, 123–24), and ties general allegations of fraudulent conduct to the tables of claims contained in the exhibits to the Complaint (see id. ¶¶ 136–38, 154, 159), these allegations do not suffice to provide sufficient particularity regarding the several theories of fraud stated in the Appendix.

particularity necessary to tie the specific mailings and claims back to the broader RICO scheme alleged in the Complaint.  Relatedly, while the charts indicate claim codes for each alleged fraudulent billing, there is no way to determine from the pleadings exactly what DME or orthotic device was prescribed and whether the fraudulent representation related to the medical need for the device or whether it related to the specific type of device ordered.

RICO requires that the pleadings identify at least two predicate acts attributable to the defendants.  See 18 U.S.C. § 1961(5) (defining a "pattern" of racketeering activity as "at least two acts . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity").   Given the extensive nature of the charts attached to the Complaint, it cannot be too difficult for plaintiff to provide the necessary details for at least two of the alleged mail fraud claims.  Accordingly, while the Court finds that the Complaint as currently structured fails to satisfy the predicate act requirements of the statute, and defendants' motion to dismiss the RICO claim, but gives plaintiffs leave to amend its Complaint to cure this pleading defect.

    C.    <u>Proximate Cause</u>

Defendants raise other issues with respect to the sufficiency of plaintiffs' Complaint insofar as it alleges violations of RICO, including a failure to adequately plead proximate cause and the timeliness of plaintiffs' claims.

In pleading a cause of action for damages under RICO, plaintiff "must not only prove (1) that defendants violated Section 1962 and (2) that she suffered an injury to her 'business  or property,' but also (3) that her injury was caused 'by reason of' the RICO violation – a standard that we have equated to the familiar 'proximate cause' standard."  <u>D'Addario v. D'Addario</u>, 901 F.3d 80, 96 (2d Cir. 2018).  Defendants contend that Allstate cannot show that the defendants or their alleged conduct were the proximate cause of Allstate's injury, given that the DME and orthotic devices were prescribed by doctors and other health care providers based on their

determination of the patients' needs.  (Defs.' Mem. at 14).  Defendants argue that given that the

physicians relied on a variety of factors, Allstate cannot demonstrate proximate cause tied to the

conduct of the defendants.  (Id. (citing  UFCW Loc. 1776 v. Eli Lilly & Co., 620 F.3d 121, 134

(2d Cir. 2010))).[12]

Courts have made it clear in cases involving similar No-fault insurance schemes that

where the insurer pays fraudulent claims in justifiable reliance on misrepresentations in the

claims submissions, there has been sufficient allegation of RICO injury.  See, e.g., State Farm

Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C., No. 04 CV 5045, 2008 WL 4146190, at *12

(E.D.N.Y. Sept. 5, 2008) (denying motion to dismiss finding that the "insurer's financial losses

flow directly from the fraudulent scheme" where the defendants mailed or caused the mailing of

fraudulent claims and the insurer, relying on those submissions, paid the claims); State Farm

Mut. Auto. Ins. Co. v. Grafman, 655 F. Supp. 2d at 229.

Here, the Complaint alleges that the defendants submitted hundreds of fraudulent claims

to Allstate and that these claims alleged a variety of misrepresentations as to the medical need for

the DME, the cost of the DME, whether the DME was actually provided and whether defendant

was entitled to reimbursement.  (See, e.g., Compl. ¶¶ 5–10).  In addition to the managers and

owners of the various No-fault Clinics, who are alleged to have facilitated defendants' scheme

by taking kickbacks to ensure that virtually identical DME was prescribed irrespective of

medical necessity, the defendants themselves are alleged to have secured the prescriptions in

order to commit the fraud and then submitted the fraudulent claims to Allstate, knowing that the

---

[12] Defendants rely on the case of UFCW Local 1176 v. Eli Lily & Co., and Sergeants Benevolent Ass'n
Health & Welfare Fraud v. Sanofi-Aventis U.S. LLP, 20 F. Supp. 3d 305 (E.D.N.Y. 2014), both of which are
inapposite to the instant case.  In both cases, the representations were not made directly to the insurer but to doctors,
the FDA, and marketing campaigns, and the courts held that the doctors' reliance on these misrepresentations were
intervening actions between the conduct giving rise to the fraud and the conduct directly causing the harm.  Here, by
contrast, defendants submitted the fraudulent billings directly to Allstate, causing the harm.

prescriptions were fraudulent.  (Id.)  As Allstate notes, each fraudulent billing submission caused plaintiff to pay out on the fraudulent claim, causing plaintiff's financial losses.  In light of those allegations, the Court finds that plaintiffs have adequately pleaded proximate cause.

     D.    Timeliness

Civil RICO claims are subject to a four-year statute of limitations.  Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143 (1987).  "The statute of limitations is triggered when plaintiffs discover their RICO injury, not when the plaintiffs discovered or should have discovered the underlying pattern of racketeering activity, even if the pattern or racketeering activity includes fraud."  Frankel v. Cole, 313 F. App'x 418, 419–20 (2d Cir. 2009).

Defendants contend that although the Complaint seeks a total of $684,800 in damages and lists the dates of the scheme as "beginning on October 23, 2013 and continuing until the present," plaintiffs do not delineate which bills are at issue; indeed, they note that "the vast majority of bills which Allstate seeks to clawback relate to mailing of bills prior to the four-year statute of limitations."  (Defs.' Mem. at 21–22).  Plaintiffs refute defendants' position, arguing that "each individual claim submission has its own limitations period, meaning any billing fraud that occurred on or after August 2019 (4 years prior to when the complaint was filed) can form the basis of a timely RICO or fraud claim."  (Pls.' Opp. at 14 (citing Liberty Mut. Ins. Co. v. Excel Imaging, P.C., 879 F. Supp. 2d at 264)).  Plaintiffs maintain that at least 130 of the fraudulent claims were made after 2019 and thus fall within the four-year statutory period.  (Id.)  Moreover, plaintiffs maintain that "[t]he Complaint clearly alleges that due to the great lengths Defendants went through to systematically conceal their fraud, Allstate did not discover, and should not have reasonably discovered, their damages until shortly before filing the Complaint," and thus that all of plaintiffs' claims are timely.  (Id. (citing Compl. ¶¶ 94–95, 161–63, 182–83)).

The Court agrees with plaintiffs that any claims related to fraudulent billing that occurred after August 2019 are clearly timely within the four-year period provided by the statute irrespective of when plaintiffs discovered the injury stemming from said billing conduct.  As for claims related to fraudulent submissions that occurred before that date, the paragraphs of the Complaint to which plaintiffs cite simply do not support their argument.  Although the Complaint does suggest that the defendants took steps to conceal their allegedly fraudulent conduct, nowhere do plaintiffs state the date on which they discovered their injury.  Rather, plaintiffs allege that they "did not discover and should not have reasonably discovered that their damages *were attributable to fraud* until shortly before they filed this Complaint."  (Compl. ¶ 163 (emphasis added)).  However, the critical date is not when plaintiffs learned of the cause of their injury but, rather, when they became "aware, or should have been aware, of the injury" itself.  Frankel v. Cole, 313 F. App'x at 420.  Although plaintiffs presumably sustained the alleged injuries when the fraudulent claims were paid, "it is not clear from the face of the complaint when plaintiffs . . . discovered those injuries."  Id.  Therefore, plaintiffs have not adequately pleaded facts to establish that their claims relating to bills submitted during or prior to August 2019 are timely, and those claims should be dismissed at this time, with leave to replead.[13]

E.    Summation

For the reasons set forth above, defendants' motion to dismiss is GRANTED with respect to plaintiffs' RICO claims on the grounds that:  (1) plaintiffs have not adequately alleged

---

[13] The Court notes that in repleading their RICO claims, plaintiffs need not allege facts beyond what is necessary to establish the date on which their injury was discovered, as requiring any more particularity with respect to the issue of the timeliness of these claims would ask plaintiffs to draw upon "facts that are beyond the pleadings and that have yet to be developed."  State Farm Mut. Auto. Ins. Co. v. Accurate Med., P.C., 07 CV 0051, 2007 WL 2908205, at *2 (E.D.N.Y. Oct. 4, 2007).

predicate acts under Rule 9(b); and (2) with respect to fraudulent claims submitted during or prior to August 2019, plaintiffs have not adequately alleged facts to establish the date upon which their injury was discovered.  However, because the issues with plaintiffs' RICO claims as pled appear remediable, plaintiffs are granted leave to amend the Complaint to address said issues.  Defendants' Motion is DENIED with respect to all other grounds for dismissing plaintiffs' RICO claims.

III.   Plaintiffs' Fraud and Unjust Enrichment Claims

In addition to alleging claims under RICO, plaintiffs also assert claims of fraud and unjust enrichment against defendants.  Defendants move to dismiss these claims, contending that the fraud claim fails to satisfy the pleading requirements of Rule 9(b), and the unjust enrichment claim is not developed sufficiently to establish the necessary elements of such a claim.

A.   Common Law Fraud

In alleging a claim of common law fraud, the plaintiffs must allege that there are facts demonstrating:  1) a material misrepresentation or omission of fact; 2) made with knowledge of its falsity; 3) reliance by plaintiffs on the misrepresentations; 4) and damages caused by the misrepresentations.  See Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997);  Allstate Ins. Co. v. Polack, No. 08 CV 0565, 2012 WL 4489282 (E.D.N.Y. Sept. 12, 2012), report and recommendation adopted, 2012 WL 4490775 (E.D.N.Y. Sept. 28, 2012). Under New York law, a plaintiff alleging common law fraud can establish an inference of scienter when facts are alleged showing that 1) defendants had both motive and opportunity to commit fraud; or 2) there was "strong circumstantial evidence of conscious misbehavior or recklessness."  380544 Canada, Inc. v. Aspen Tech., Inc., 633 F. Supp. 2d 15, 29 (S.D.N.Y. 2009) (quoting Kalnit v. Eichler, 264 F.3d 131, 138-39 (2d Cir. 2001)).

As with the RICO claims, defendants contend that the plaintiffs' fraud claim allegations lack sufficient particularity to satisfy Rule 9(b) in that they fail to identify the patients who were provided with DME as a result of kickbacks, the No-Fault clinics and health care providers that participated in the scheme, and they fail to identify the mechanism of the kickback scheme or the specific claims paid that were part of the kickback scheme.  (Defs.' Mem. at 22–23).  Allstate argues that not only has the Complaint adequately pleaded the basis of the fraud claim by describing the submission of medically unnecessary, inflated insurance claims, but the chart provided with the Complaint specifically identifies each patient by claim number and initial.  (Pls.' Opp. at 16, n. 7).  In addition to submitting fraudulent prescriptions that were designed to conceal the fact that the prescriptions were issued pursuant to a predetermined protocol and a kickback scheme, the Complaint alleges that the prescriptions were sent directly to defendant CPM Med to eliminate the possibility that the Covered Person would take them to be filled other than at one of the participating clinics.  (Id. at 17).  Moreover, Allstate contends that irrespective of the kickback scheme, the fraudulent scheme involved the submission of grossly inflated charges for DME for time periods exceeding medically reasonable duration.  (Id.)

Not only do these allegations sufficiently describe the various aspects of the fraudulent scheme, but they also demonstrate that the defendants had both a motive and opportunity to commit the alleged fraud and provide circumstantial evidence of conscious misbehavior or recklessness by the defendants. See Government Emps. Ins. Co. v. Hollis Med. Care, P.C., 2011 WL 5507426, n.11 (finding allegations that defendants used professional corporation to submit fraudulent claims sufficient to allege scienter); see also Shields v. Citytrust Bancorp., 25 F.3d 1124, 1130 (2d Cir. 1994) (describing motive as "entail[ing] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," and

opportunity as "entail[ing] the means and likely prospect of achieving concrete benefits by the means alleged").  The Complaint also adequately alleges the third and fourth elements of fraud in that Allstate justifiably relied on the facially valid documents submitted or caused to be submitted by the defendants in determining whether to pay claims, and suffered injury as a result because it paid out significant amounts with the belief that it was obligated to do so, when in fact it was not.  See Government Emps. Ins. Co. v. Damien, No. 10 CV 5409, 2011 WL 5976071, at *4 (E.D.N.Y. Nov. 3, 2011) (holding that insurer's claim of reasonable reliance based on the statutory and contractual obligations to respond promptly to facially valid claims for no-fault payments was sufficient to satisfy the reliance element, and payments upon these fraudulent claims, when under no obligation to make such payments, sufficiently stated the damage element for fraud), report and recommendation adopted, 2011 WL 6000571 (E.D.N.Y. Nov. 29, 2011); see also AIU Ins. Co. v. Olmecs Med. Supply, Inc., 2005 WL 3710370 (holding that an insurer's allegations that they relied on "facially valid" no-fault claims satisfies the reliance element necessary to state a claim of fraud).

Therefore, defendants' motion to dismiss with respect to plaintiffs' common law fraud claims is DENIED.

B.    Unjust Enrichment

"The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."  Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004), cert. denied, 544 U.S. 949 (2005). Plaintiffs have alleged that:  (1) defendants submitted fraudulent claims forms that misrepresented the medical necessity of DME, the nature, quality and cost of the DME, and whether the items were actually supplied; (2) plaintiffs, in reliance on these fraudulent claims

26

submissions reimbursed defendants for the amounts requested; (3) defendants requested and accepted such payments at plaintiffs' expense; and (4) it is against equity and good conscience to permit the defendants to retain these payments based on fraudulent claims.

Defendants argue that the claim as pleaded in the Complaint is insufficient because it only consists of four paragraphs, concluding with the statement that defendants "have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep."  (Defs.' Mem. At 23 (quoting Compl. ¶ 190)).  Defendants contend that since the claim contains no allegations and "simply piggybacks on the fraud claim," plaintiffs may not avoid Rule 9(b) pleading requirements.  (Id. at 23–24).

Given the extensive nature of the allegations in the Complaint leading up to and incorporated by reference in the unjust enrichment claim, the Court finds that plaintiffs have adequately pleaded all the necessary elements of a claim for unjust enrichment.  Thus, it is respectfully recommended that defendant's motion to dismiss the unjust enrichment claim be denied.

IV.  Res Judicata and Collateral Estoppel

Defendants also contend that Allstate's claims of fraud and violations of RICO are barred by the doctrines of *res judicata* and collateral estoppel, given that the question of lack of medical necessity has been litigated in numerous arbitrations and cannot now be re-litigated in this action.  (Defs.' Mem. at 18).  The doctrines of *res judicata* and collateral estoppel serve the "dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979).  "Under *res judicata,* or claim preclusion, a party to a litigation resolved on the merits is bound by the outcome of that dispute and,

consequently, cannot relitigate claims that were or could have been raised in the prior

forum." <u>Roganti v. Metro. Life Ins. Co.</u>, No. 12 CV 161, 2012 WL 2324476, at *4 (S.D.N.Y.

June 18, 2012) (citing <u>Maharaj v. Bankamerica Corp.</u>, 128 F.3d 94, 97 (2d Cir.1997)).  Thus,

where a final judgment on the merits has been entered by a court of competent jurisdiction in a

case involving the same claim or cause of action and the same parties, further claims arising

from the same "operative nucleus of facts" are barred.  <u>Cameron v. Church</u>, 253 F. Supp. 2d 611,

619 (S.D.N.Y. 2003) (citing <u>In re Teltronics Servs., Inc.</u>, 762 F.2d 185, 190 (2d Cir. 1985)); <u>see</u>

<u>also</u> <u>Pike v. Freeman</u>, 266 F.3d 78, 91 (2d Cir. 2001).  This "rule applies equally to

arbitrations."  <u>Roganti v. Metro. Life Ins. Co.</u>, 2012 WL 2324476, at *4*; see <u>Jacobson v.</u>

<u>Fireman's Fund Ins. Co.</u>, 111 F.3d 261, 267–68 (2d Cir. 1997) (holding that under New York

law, "res judicata and collateral estoppel apply to issues resolved by arbitration where there has

been a final determination on the merits, notwithstanding a lack of confirmation of the award");

<u>Farber v. Goldman Sachs Grp. Inc.</u>, No. 10 CV 873, 2011 WL 666396, at *3 (S.D.N.Y. Feb. 16,

2011) (finding claims barred by a prior FINRA arbitration).

 Under Section 5106(b) of the New York No-fault law, defendants may elect to arbitrate

any dispute related to the no-fault insurance payments. Specifically, Section 5106(b) of the New

York No-fault Insurance Law requires that:

> Every insurer shall provide a claimant with the option of
> submitting any dispute involving the insurer's liability to pay first
> party benefits, or additional first party benefits, the amount thereof
> or any other matter which may arise pursuant to subsection (a) of
> this section to arbitration pursuant to simplified procedures to be
> promulgated or approved by the superintendent.

N.Y. Ins. Law § 5106(b).

 Defendants contend that numerous claims listed by plaintiffs in the various exhibits

attached to the Complaint, have already proceeded to arbitration under this provision of the No-

fault law and have been either adjudicated in defendants' favor or voluntarily resolved by Allstate. (Defs.' Mem. at 18). Specifically, in a Declaration submitted by Neil Torczyner, counsel for defendants, he contends that numerous claims identified in Allstate's exhibits to the Complaint are claims that proceeded to arbitration where the claims were either adjudicated in favor of defendants or were settled and voluntarily paid by Allstate. (Torczyner Decl.[14] ¶ 12). He identifies by claim number 18 claims in Allstate's Exhibit 1, which lists claims allegedly provided based upon a predetermined course of treatment regardless of medical necessity, that Torczyner states proceeded to arbitration and were either settled or subject to arbitration awards in favor of defendants. (Id. ¶¶ 5, 6). He also represents that 282 claims in Exhibit 2, purporting to be unpaid claims forming the basis for Allstate's claim for declaratory relief, also went to arbitration and were adjudicated or resolved through settlement. (Id. ¶¶ 7, 8). Similarly, with respect to Exhibit 3, listing claims based on fraudulent bills under Codes E0935 or E0936, and Exhibit 4, listing claims based on fraudulent billing Codes E0236 and E0218, Torczyner asserts that 161 of the claims in Exhibit 3, and 91 of the claims in Exhibit 4 have been adjudicated in arbitration awards or voluntarily settled. (Id. ¶¶ 9–12). The Torczyner Declaration provides details for a number of them. (Id. ¶¶ 15–42). Thus, defendants argue that *res judicata* acts as a bar to plaintiff's attempt to relitigate these claims in this action.

In opposing defendants' motion to dismiss, plaintiffs contend that defendants' arguments are premature at this stage of the litigation, noting that *res judicata* and collateral estoppel are "ordinarily pled as affirmative defenses and thus neither will typically serve as the basis for a pre-answer motion to dismiss." (Pls.' Opp. at 21 (quoting Government Emps. Ins. Co. v. Axial Chiropractic P.C., No. 19 CV 5570, 2021 WL 2791599, at *2 (E.D.N.Y. July 5, 2021))). Allstate

---

[14] Citations to "Torczyner Decl." refer to the Declaration of Neil Torczyner, dated November 29, 2023 (ECF No. 20-1).

contends that since the grounds cited by defendants in support of their motion to dismiss on collateral estoppel or *res judicata* are not present on the face of the Complaint, nor are they a matter of public record, the motion to dismiss must be denied.  (Id. (citing Allstate Ins. Co. v. Elzanaty, 916 F. Supp.2d 273, 299 (E.D.N.Y. 2013) (holding that "[a] party may properly raise a defense of res judicata or collateral estoppel on a motion to dismiss. . .only where the basis for that defense is set forth on the face of the complaint or established by the public record")).

Moreover, apart from noting that defendants have only challenged a sample of claims, plaintiffs contend that Allstate did not assert a defense of fraud in the No-fault arbitrations nor could the issues raised in this case have been litigated and decided in the limited or individual arbitrations.  (Id. at 21).  Allstate was never afforded the "full and fair opportunity" to conduct discovery or litigate the full scope of defendants' wide-spread fraud or the pattern of defendants' conduct in arbitrations, which by law, are designed to be "'an expedited, simplified affair meant to work as quickly and efficiently as possible. . .[where] discovery is limited or non-existent.'" (Id. at 22 (quoting Government Emps. Ins. Co. v. Barakat, No. 22 CV 7532, 2024 WL 22769, at * 2 (E.D.N.Y. Jan. 2, 2024))).  Finally, plaintiffs note that the arbitration of individual claims or groups of claims have been held to be "simply not the appropriate venue to litigate large-scale, complex fraud allegations involving thousands of claims over the course of several years," particularly in a case like this where the pattern of a predetermined treatment protocol cannot be discerned simply by review of medical records limited to the claim at issue before the arbitrators. (Pls.' Opp. at 22 (quoting Government Emps. Ins. Co. v. Beynin, No. 19 CV 6118, 2021 WL 1146051, at * 6 (E.D.N.Y. Mar. 25, 2021))).

Although defendants may have raised factual arguments regarding claim preclusion with respect to certain specific claims, the Court agrees that there is no basis on the face of the

Complaint to recommend dismissal of the entirety of plaintiffs' RICO and fraud claims.  Even if

the doctrines of collateral estoppel and *res judicata* were ultimately found to prevent Allstate

from recovering damages on certain claims where the issues may have been addressed during an

arbitration, "that would not undermine the merit of [Allstate's] overall theory of liability."

Government Emps. Ins. Co. v. Right Solution Medical Supply, Inc., No. 12 CV 0908, 2012 WL

6617422, at *6 (E.D.N.Y. Dec. 19, 2021).  Defendants' Motion is therefore DENIED with

respect to defendants' arguments for dismissal premised on *res judicata* and collateral estoppel.

V.   Jurisdiction Over the Declaratory Judgment Claim

Defendants' last argument focuses on plaintiffs' cause of action seeking a declaratory

judgment that it is exempt from paying for outstanding claims for DME submitted by defendants.

(Defs.' Mem. at 24–25).  Defendants argue that there is no pending controversy that would be

aided by a declaratory judgment and that Allstate's arguments regarding the lack of medical

necessity would require individualized showings as to each prescribed DME.  (Id.)

Citing the decision of the Second Circuit in N.Y. Times Co. v. Gonzales, 459 F.3d 160,

167 (2d Cir. 2006), defendants argue that there are five factors that the court should consider

before entertaining a claim for a declaratory judgment:

> (i)"whether the judgment will serve a useful purpose in clarifying
> or settling the legal issue involved"; (ii) "whether a judgment
> would finalize the controversy and offer relief from uncertainty";
> (iii) "whether the proposed remedy is being used merely for
> 'procedural fencing' or a 'race to res judicata'"; (iv) "whether the
> use of a declaratory judgment would increase friction between
> sovereign legal systems or improperly encroach on the domain of a
> state or foreign court"; and (v) "whether there is a better or more
> effective remedy."

(Defs.' Mem. at 24).  Defendants contend that not only do Allstate's theories of fraud premised

on an alleged "kickback scheme" and lack of medical necessity fail as a matter of law, but the

medical necessity for each prescription of DME would need to be based on an individualize showing.  (Id. at 24–25).

In response, Allstate contends that the Complaint has sufficiently alleged the necessary detail to demonstrate that defendants engaged in a scheme to defraud with a pattern of "wide-scaled" fraudulent conduct, including the submission of bills for the same or similar therapies without medical necessity.  (Pls.' Opp. at 24).  Moreover, plaintiffs cite a number of cases in this district that have granted declaratory relief where the defendants were involved in similar fraudulent schemes.  (Id. at 24–25 (citing cases)).  "It is well-established in this district that, where an insurer has not yet paid out no-fault benefits, the insurer may bring an action for a declaratory judgment that it is not liable for any unpaid claims because the provider has committed fraud or breached applicable No-fault regulations."  State Farm Mut. Auto. Ins. Co. v. Kotkes, 22 CV 3611, 2023 WL 4532460, at *7 (E.D.N.Y. July 13, 2023).

In light of the above, defendants' Motion is DENIED with respect to plaintiffs' declaratory judgment claim.

<u>CONCLUSION</u>

For the reasons set forth above, defendants Motion to Dismiss is GRANTED as to the RICO claims, and DENIED in all other respects.  Plaintiffs shall file any Amended Complaint on or before **October 11, 2024**.

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      August 27, 2024

                        /s/ Cheryl L. Pollak
                        Cheryl L. Pollak
                        United States Magistrate Judge
                        Eastern District of New York